IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re ) | |
| ) | |
| HOLLY MARINE TOWING, INC., ) | |
| ) | |
| Debtor. ) | |
| ) | Case No. 10 C 1204 |
| SCOULER & CO., ) | |
| ) | Judge Virginia M. Kendall |
| Appellant, ) | |
| v. ) | |
| ) | |
| BAUCH & MICHAELS, LLC, ) | |
| ) | |
| Appellee. ) | |

## MEMORANDUM OPINION AND ORDER

The debtor, Holly Marine Towing, Inc. ("Holly Marine"), filed for bankruptcy. Glenn Dawson ("Dawson") and Holly Headland ("Headland"), previously married and principals of Holly Marine, entered into an agreement with the Trustee regarding distribution of proceeds from selling the marine facility located at 9320 S. Ewing in Chicago ("Ewing Property"). As a result of the agreement, the Trustee received 50% of the proceeds and Dawson and Headland each received 25%. Dawson and Headland paid Bauch & Michaels, LLC ("Bauch"), Holly Marine's bankruptcy attorney, out of these proceeds. Scouler & Co. ("Scouler"), an entity which provides financial and risk management services, was also awarded approximately $24,000 for administrative and professional services provided to Holly Marine during the administration of the Chapter 11 case. The Bankruptcy Court approved this agreement despite Scouler's objection. Scouler appeals this decision, maintaining that it violates the priority scheme and was not in the best interest of the estate. Bauch moves to dismiss Scouler's appeal for lack of standing and the Trustee moves to dismiss based on

defective notice of appeal. For the following reasons, the Court denies the motions to dismiss and affirms the Bankruptcy Court's ruling.

## STATEMENT OF FACTS

**I.     Distribution of Proceeds to Bauch**

The debtor, Holly Marine Towing, Inc. ("Holly Marine"), owned commercial tugboats and provided towing and other marine-related services, and operated its facility at 9320 S. Ewing in Chicago. Holly Marine filed Chapter 11 bankruptcy on January 8, 2007 with the goal of continuing its business and paying off creditors over time. On March 26, 2008, however, the Bankruptcy Court entered an order converting the case to Chapter 7 Liquidation bankruptcy, where a Trustee was to take control of Holly Marine's assets, convert them to cash, and pay creditors.

When the Bankruptcy Court appointed a Trustee, there were two separate disputes in the background of the bankruptcy proceedings. First, there was a divorce proceeding between Dawson and Headland, where both asserted interests—Dawson as the holder of title and Headland through marital property—in the Ewing Property. Second, Holly Marine had sued Dawson for breach of fiduciary duty and usurping corporate opportunities and sought declaratory relief that the Ewing Property was part of the bankruptcy estate. Upon appointment, the Trustee took over this proceeding for Holly Marine.

As settlement for the Trustee's claims against Dawson and the marital property dispute between Dawson and Headland, the Bankruptcy Court approved the Trustee's sale of the Ewing Property. After paying the fees and taxes, the proceeds from the sale of property were $911,620.40. The Trustee, Dawson, and Headland then agreed to distribution of this amount amongst themselves.

The estate, via the Trustee, would receive 50% ($458,252.18) and Dawson and Headland would each receive 25% ($229,126.09). All claims between the parties would also be released.

An agreed order filed by the Trustee, Dawson, and Headland detailed the distribution of Dawson and Headland's proceeds. Of Dawson's $229,126.09, he would keep $79,126.09 and $150,000 would be paid to Adelman & Gettleman, Ltd., his counsel. For Headland, all of her $229,126.09 went to her counsel, Joseph Mitchell. The Trustee filed and validly noticed a Motion to Approve this agreed order, to which Scouler did not object.

At the December 30, 2009 hearing on the motion, Bauch objected to the agreed order because it did not to receive any of the proceeds. As such, hand-written changes were made to the agreed order giving Bauch a portion of Dawson and Headland's proceeds, and the new updated order ("Settlement Agreement") was submitted to the Bankruptcy Court. The Settlement Agreement altered the distribution of the proceeds as follows: Dawson kept $69,126.09, Adelman & Gettleman received $140,000, and Bauch received $20,000; for Headland, $184,126.09 went to Joseph Mitchell and $45,000 to Bauch. Scouler did not receive notice of Dawson and Headland's amended distributions to Bauch. The Bankrupcy Court approved the Settlement Agreement.

Bauch therefore received $65,000 for its services provided during the Chapter 11 case and for withdrawing its objection to the initial agreed order. This appeal centers around the propriety of that distribution.

## II. Payment Arrangement for Administrative Claimants

Holly Marine was involved in various financing arrangements with Fifth Third Bank, its lender. Holly Marine's property was also subject to federal and state tax liens, and the value of the liens was greater than the value of its assets. As such, Holly Marine was able to maintain possession

of its assets and run its business through cash collateral orders. Holly Marine used these orders that contained "carve outs" to pay fees for its own professionals and the Committee's professionals. In essence, a "carve out" is where a party with a security interest in the estate allows part of its lien proceeds to be paid to another party. After the court-approved sale of the majority of Holly Marine's assets on February 12, 2008, FH Partners, the assignee of Fifth Third Bank's interest, Holly Marine, and the Committee stipulated that $70,000 would be paid to the Committee and set aside to satisfy "carve outs" for professionals.

Scouler is a company the Committee hired to provide financial advice to Holly Marine. After providing financial services to Holly Marine, the Bankruptcy Court approved Scouler's fee application on March 27, 2008 for $24,094.88. Scouler appeals the Bankruptcy Court's decision to approve the Settlement Agreement, which allowed Bauch to collect $65,000 from Dawson and Headland but failed to provide it with payment for its fees.

The Settlement Agreement dated January 20, 2010 was entered on January 25, 2010, and Scouler timely filed its Notice of Appeal on February 1, 2010. This Court has jurisdiction under 28 U.S.C. § 158(a)(1).

## STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's approval of the Settlement Agreement between Dawson, Headland, and the Trustee for abuse of discretion. *Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582, 586-87 (7th Cir. 1994). "If the decision demonstrates a command of the case, we will not engage in second-guessing; the bankruptcy court is in a better position 'to consider the equities and reasonableness of a particular compromise.'" *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) (quoting *In re Am. Reserve Corp.*, 841 F.2d 159, 162 (7th

Cir. 1987)). The Court examines findings of fact for clear error and conclusions of law de novo. *In re Doctors Hosp. of Hyde Park*, 474 F.3d at 426.

## DISCUSSION

I. **Motion to Dismiss**

Bauch moves to dismiss Scouler's appeal for lack of standing. Specifically, Bauch contends that Scouler does not have a pecuniary interest in this appeal. The Trustee also contends that Scouler filed a defective notice of appeal because it lists Bauch, the Trustee, and Scouler but not other parties with an interest in the appeal, such as Dawson, Headland, Mitchell, and Adelman.

A. **Standing**

Standing to appeal a bankruptcy order turns on whether the appellant has a "pecuniary interest in the outcome of the bankruptcy proceedings." *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998). In other words, there must be a "reasonable possibility" that Scouler could obtain a surplus in the estate. *Id.* at 608.

Specifically, Bauch maintains that Scouler agreed to receive its fees out of the Committee's $70,000 carve out. As a result, Bauch argues, because the Committee carve out fully provides for payment to Scouler, Scouler is bound to receive payment only from the Committee carve out, not from a potential disgorgement and pro rata distribution of the proceeds at issue on appeal. This claim, however, does not comport with the Bankruptcy Court's record. Despite the Committee's representations that Scouler would be paid from the carve out, the Bankruptcy Court's order granting Scouler's fee application simply found that Scouler's services benefitted the estate, the amount requested was reasonable, and that Scouler was entitled to $24,094.88 as a result of its "chapter 11 administrative expenses." (R. 457.) The order clearly allowed Scouler the ability to receive payment

5

from unencumbered assets distributed via the priority scheme. It did not, however, bind Scouler to only receive proceeds from the Committee carve out, which is a different payment source altogether. As such, the Committee counsel's representation to the Bankruptcy Court that Scouler would be paid through the carve out does not, in turn, bar Scouler from collecting on the administrative claim.

As a creditor of Holly Marine, Scouler has a pecuniary interest in how the assets of the estate are distributed and this is sufficient to confer standing. As in *In re Cult Awareness Network, Inc.*, Scouler is a creditor and "recipient[] of the proceeds of the estate." 151 F.3d at 610. Scouler has a "pecuniary stake in the manner in which the estate is liquidated," namely an interest in how the proceeds are distributed among the claimants. *Id.* Thus, Scouler has standing to appeal the Bankruptcy Court's Settlement Agreement.

**B.      Notice of Appeal**

The Trustee also claims that the ineffective notice of appeal is fatal to Scouler's appeal. The Trustee, Dawson (through counsel Adelman & Gettleman), Headland (through counsel Joseph Mitchell), and Bauch were parties to the Settlement Agreement but the notice of appeal only listed Bauch, the Trustee, and Scouler. Federal Rule of Bankruptcy Procedure 8001(a) states that the notice of appeal must "contain the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their respective attorneys." For violations of this rule the Court has discretion to take action that it "deems appropriate." Fed. R. Bankr. P. 8001(a).

Failing to strictly meet Rule 8001(a) is not a jurisdictional defect in that a "failure to comply, however innocuous, spells doom for the appeal." *Fadayiro v. Ameriquest Mortgage Co.*, 371 F.3d 920, 922 (7th Cir. 2004). "Literal compliance" with Rule 8001(a) is not required; rather, the

appellant need only "conform substantially." *Id.* at 923. The plain wording of Rule 8001(a) gives the Court discretion in deciding whether to dismiss the appeal for failure to strictly comply with its requirements. The proceeds at issue on appeal are Bauch's, who was included on the notice of appeal, and the Court has a complete record before it to decide the merits. The Court therefore denies the Trustee's motion to dismiss based on defective notice.

## II.     Bankruptcy Appeal

Scouler asserts that the Bankruptcy Court's Settlement Agreement is invalid under bankruptcy law for two independent reasons: (1) it violates the rule of priorities for distribution of proceeds among administrative claimants; and (2) it was not in the best interest of the estate.

### A.     Priority Scheme

Scouler claims that Bauch impermissibly received $65,000 from the Settlement Agreement because Bauch, who is similarly situated as an administrative claimant to Scouler, received these proceeds and bypassed the rule of priorities, which requires pro rata distribution of proceeds to Scouler and others. Bauch and the Trustee respond that the priority rules do not apply because the distribution to Bauch involved non-estate assets.

Under 11 U.S.C. § 726(b), Chapter 7 administrative claims hold a "superpriority" so after those claims have been satisfied, the remaining portion of the estate is distributed to the Chapter 11 administrative creditors. *See* 11 U.S.C. § 507; *In re Resource Tech. Corp.*, 356 B.R. 435, 448 (Bankr. N.D. Ill. Dec. 4, 2006). If insufficient funds are left to fully satisfy the Chapter 11 claims, the estate is divided among the Chapter 11 administrative creditors pro rata. *In re Resource Tech. Corp.*, 356 B.R. at 448. These creditors therefore often receive less than the full value of their services. But the rule of priorities equalizes this shortfall by requiring pro rata distribution of

7

proceeds to the administrative creditors. *Id.* The rule of priorities, though, only applies to distribution of the "property of the estate." 11 U.S.C. § 726(a).

This is precisely why Bauch and the Trustee contend that Scouler's appeal lacks merit. They do not contest the legal validity of the priority rule, but argue that it does not apply because the distribution of $65,000 to Bauch came from Dawson and Headland's non-estate assets.

The Bankruptcy Court, at the January 20, 2010 hearing on Scouler's Motion to Alter and Amend the Settlement Agreement, specifically challenged whether the distribution to Bauch involved estate property:

> How is it going to go back to the estate? This was Holly Headland's funds that went to Bauch & Michaels, correct? She made a decision that she wanted to give some of the money she was going to get in settlement, for whatever reason, to Bauch & Michaels.

(Jan. 20, 2010 Hr'g, Tr. 4:16-21.) The Bankruptcy Court denied Scouler's motion for this reason, coupled with the fact that the distribution to Bauch had no affect on the administration of the estate because regardless of whether Bauch took the proceeds or Dawson and Headland kept the proceeds, the estate would receive the same amount: $458,252.18.[1]

The Bankruptcy Court conducted hearings and briefing on this issue before making its determination. For example, the Bankruptcy Court authorized sale of the Ewing Property on January 21, 2009, and specifically entered an order on August 20, 2009 allowing sale of the Ewing Property to Ewing Calumet. (R. 552, 565, 635.) It was familiar with the interests that the Trustee, Dawson, and Headland all claimed in the Ewing Property , the underlying complaint by the Trustee against

---

[1] Scouler, and other similarly situated administrative claimants, presumably were eligible to receive a portion of these proceeds. The Trustee maintains that a significant IRS secured claim would exhaust these proceeds before getting to the Chapter 11 claimants. This issue, however, and the facts necessary to make such a finding, are not before the Court. Regardless, the $65,000 were non-estate assets.

8

Dawson, and the ongoing divorce proceedings between Dawson and Headland. (Doc. 552.) It also reviewed the original agreed order, the Settlement Agreement, and after conducting a hearing, denied Scouler's objection to the Settlement Agreement.

Moreover, the nature of the agreement between the Trustee, Dawson, and Headland confirms that Dawson and Headland chose to give their own non-estate assets to Bauch. Holly Marine sued Dawson for breach of fiduciary duty and sought a declaration that the Ewing Property was an estate asset. At the same time, Dawson and Headland were working out their property interests in the divorce proceeding. The Trustee, Dawson, and Headland all agreed to sell the Ewing Property and distribute the proceeds to settle the pending disputes. As such, the Trustee received, for the estate, 50% of the proceeds, which amounted to $458,252.18. Bauch received none of these proceeds. Rather, the proceeds that Bauch received came from Dawson and Headland's personal assets that they obtained for settling the fiduciary duty case and splitting up their marital property. These were non-estate assets with which Dawson and Headland were free to distribute as they desired.[2] *See, e.g., In re Tackley Mill, LLC*, 386 B.R. 611, 615 (Bankr. N.D. W. Va. Feb. 8, 2008) (distribution of non-estate assets are outside the Bankruptcy Code and matter of contract law between the two parties); *In re Chaparro Martinez*, 293 B.R. 387, 391 (Bankr. N.D. Tex. May 21, 2003) (debtor, or other third parties, can voluntarily pay out non-estate funds without regard for rule of priorities). That is, Dawson and Headland each received $229,126.09 in non-estate assets as a result of resolving their private disputes. The priority rule therefore does not apply to invalidate the $65,000 payment to Bauch.

---

[2] Simply put, the Trustee was not a party to Dawson and Headland's agreement to pay Bauch $65,000. The propriety of the agreement is governed by contract law defining the rights and obligations of the parties to that agreement, namely Dawson, Headland, and Bauch.

Consequently, Scouler's reliance on *In re Resource Tech. Corp.*, which voided a settlement agreement for violating the rule of priorities, is ineffective because the proceeds at issue here fall outside of the bankruptcy property's estate. 356 B.R. at 448. *Golden Bear Oil Specialties* is inapposite for this same reason. *Golden Bear Oil Specialties*, No. 01-BK-22467 (Bankr. C.D. Cal. Nov. 7, 2001) (tentative ruling). In addition, *Golden Bear* involved a settlement between the Committee and a lender, where the Committee received proceeds in exchange for waiving its ability to assert legal claims against the lender on behalf of the estate. *Id.* at *5. Because this consideration belonged to the estate, it was improper for the proceeds to go toward some, but not all, of the Chapter 11 administrative claimants. *Id.* Here, the Trustee used the estate's consideration to settle its claims against Dawson. But the critical distinction is that the consideration to Bauch was from Dawson and Headland, not the estate. The Trustee had no involvement in the separate agreement where Dawson and Headland gave their personal assets to Bauch.

B.     **Best Interests of the Estate**

Scouler also challenges the Settlement Agreement because the $65,000 that went to Bauch should have gone to the bankruptcy estate, and therefore was not in the estate's best interest.

"The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate." *Matter of Energy Co-op., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989). This calculus involves a "comparison of the settlement's terms with the litigation's probable costs and probable benefits." *In re Am. Reserve Corp.*, 841 F.2d 159, 162 (7th Cir. 1987). As stated above, because the bankruptcy judge is "uniquely positioned" to assess the fairness of the settlement, this Court reviews for abuse of discretion. *Id.* As such, it must be evident that the

10

bankruptcy judge actually exercised independent judgment as to the merits of the settlement instead of simply "rubber-stamping" the trustee's recommendation. *Id.*

The Bankruptcy Court held a hearing on January 20, 2010 to hear argument and rule on Scouler's Motion to Alter or Amend the Settlement Agreement. The Bankruptcy Court recognized that because Dawson and Headland used their own proceeds to pay Bauch, the amount of money going to the estate did not change—whether Bauch received the proceeds or not, the estate would receive $458,252.18. (Jan. 20, 2010 Hr'g, Tr. 4:1-4.) And Scouler did not object to the estate receiving $458,252.18 in the initial agreed order.[3] (Jan. 20, 2010 Hr'g, Tr. 7:21-24.) Finally, the Bankruptcy Court noted the possibility that Scouler would receive more from the estate's proceeds because Dawson and Headland satisfied Bauch's administrative claims, and thus Bauch would no longer compete with Scouler for the pro rata distribution. This sufficiently supports a finding that the Bankruptcy Court independently reviewed the Settlement Agreement.

Here, the Settlement Agreement was a settlement between the Trustee and Dawson involving allegations that Dawson breached his fiduciary duty and usurped corporate opportunities.[4] One issue in the lawsuit would have been whether Dawson individually owned the Ewing Property, or if the bankruptcy estate was entitled to it. The question, then, is was the allocation of 50% of the proceeds to the Trustee and 25% each to Dawson and Headland, of which they gave Bauch $65,000, within the range of possible litigation outcomes?

---

[3] Scouler never received notice about the precise terms of the final Settlement Agreement before the Bankruptcy Court approved it. But this does not undermine the validity of the Settlement Agreement because there was no need for Scouler to receive notice that Dawson and Headland decided to use their own proceeds to pay Bauch. After all, the Settlement Agreement did not alter the total amount that the estate received.

[4] It also included the marital property dispute between Dawson and Headland.

The Bankruptcy Court was correct to find that it was. Dawson held title to the Ewing Property sold to generate the proceeds at issue. The Ewing Property address, 9320 S. Ewing Avenue, was Holly Marine's address, and the parties would have had to litigate whether the Ewing Property was held out as an asset of the estate rather than of Dawson. *See Matter of Kaiser*, 791 F.2d 73, 77 (7th Cir. 1986) (where owners of a corporation have title in land, but a principal holds out the land as being property of the company, it is considered property of the bankruptcy estate). Dawson had title to the Property and there are no specific facts before the Court suggesting that Dawson held out the property as an estate asset. A possible outcome of the litigation would have been that Dawson owned the Ewing Property, in which case the bankruptcy estate would have received nothing.[5] There was also uncertainty about the validity of Headland's marital interest in the property. The Trustee, Dawson, and Headland entered into the Settlement Agreement to minimize the risks and costs of litigation. Weighed against the possibility that the estate would receive nothing, the $458,252.18 settlement meets the "best interest" test.

Scouler contends that the Settlement Agreement was not in the estate's best interest because Dawson and Headland, by giving Bauch $65,000 of their proceeds, were willing to settle with the Trustee for $65,000 less than they received, and these proceeds would have gone to the estate. This argument, however, assumes that Dawson and Headland paid Bauch with estate assets, and as discussed above, they did not. Further, it is not established that Dawson and Headland would have been willing to settle with the Trustee for $65,000 less than they did; in contrast, as part of the bargain, Dawson and Headland wanted the full settlement amount for the specific purpose of being

---

[5] Scouler states that "the likely outcome of litigating the conflicting claims of the Trustee, Ms. Headland, and Mr. Dawson is that the Estate—not Bauch & Michaels—would receive a net recovery." (Appellant's Br. at 10.) Scouler, however, does not articulate the reasons why this litigation outcome is likely to occur.

able to pay a portion of it to Bauch.  Finally, the standard for reviewing a settlement is whether it "fall[s] below the lowest point in the range of reasonableness." *Matter of Energy Co-op., Inc.*, 886 F.2d at 929.  Thus, speculation that Dawson and Headland may have settled for less than they did does not, by itself, invalidate the Settlement Agreement.

In sum, comparing the two obstacles the estate would have to overcome to receive the full proceeds of the Property—having to successfully litigate against both Dawson and Headland—to the amount the estate actually received via the Settlement Agreement (50% of the proceeds), the Court finds that it was within the best interests of the estate.  For this reason, and the fact that the Settlement Agreement does not violate the rule of priorities, the Court also denies Scouler's request for pro rata distribution and disgorgement.

## CONCLUSION AND ORDER

For these reasons, the Court denies Bauch and the Trustee's Motion to Dismiss and affirms the Bankruptcy Court's approval of the Settlement Agreement.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 29, 2011